# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA | CASE NO. 1:15-cv-01900-AWI-SKO |
| Plaintiff, | **ORDER ENTERING CONSENT DECREE** |
| v. | |
| GIBSON WINE CO., | |
| Defendant. | |

## I. Introduction

The United States Environmental Protection Agency ("United States" or "Government") initiated the instant environmental protection action against Gibson Wine Company ("Gibson") on December 19, 2015, related to a release of anhydrous ammonia at Gibson's winemaking facility in Sanger, California on September 11, 2012. The parties have reached a resolution of this matter, memorialized in the form of a consent decree. Doc. 70-1. The United States published notice of the consent decree and afforded an opportunity for public comment. *See* Docs. 70, 71. No comments were received within the 30-day comment period. Doc. 71. The United States now moves, unopposed, for entry of the consent decree. For the following reasons, the United States' motion will be granted.

///

## II. Legal Standard

As the United States correctly explains, the Court's review of the terms of a consent decree in an environmental protection action initiated by the EPA is limited but not empty. The Court must "actually engage with the information and explain in a reasoned disposition whether the resolution is "reasonable, fair, and consistent with the purposes that CERCLA is intended to serve." *Arizona v. City of Tucson*, 761 F.3d 1005, 1012 (9th Cir. 2014); *United States v. Montrose Chem. Corp. of Cal.*, 50 F.3d 741, 747 (9th Cir. 1995) (citation omitted). The inquiry into whether the consent decree is fair, reasonable, and consistent with the purposes of CERCLA is deferential to EPA's expertise and is based on the particular issues presented by each site and settlement. *City of Tucson*, 761 F.3d at 1013; *Securities & Exch. Comm'n v. Randolph*, 736 F.2d 525, 529 (9th Cir. 1984) ("[T]he courts should pay deference to the judgment of the government agency which has negotiated and submitted the proposed judgment."); *accord United States v. Mead*, 533 U.S. 218, 227-228 (2001) ("[C]onsiderable weight [is] given to an executive department's construction of a statutory scheme it is entrusted to administer….") (citation omitted). Indeed, consent decree "is not a decision on the merits or the achievement of the optimal outcome for all parties, but is the product of negotiation and compromise." *United States v. Oregon*, 913 F.2d 576, 580 (9th Cir. 1990). Its outcome need not be optimal in the Court's eyes to be approved. *Id*. Instead, the Court must find that the proposed consent decree is reasonable in comparison to the parties' estimates regarding liability and consistent with environmental law. *City of Tucson*, 761 F.3d at 1013.

## III. Discussion

A. The Relief Sought in the Operative Complaint and Gibson's Position

The United States alleged four claims for relief, collectively identifying a total of 21 theories of alleged violations of federal environmental law. The claims for relief detailed violations of sections 112(r)(1) and (7) of the Clean Air Act ("CAA"), section 103 of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), and Section 304 of the Emergency Planning and Community Right-To-Know Act ("EPCRA"). First Amended Complaint, Doc. 36 ("FAC" at ¶ 1. In that complaint the United States sought a

considerable, albeit not precisely calculable, sum in civil penalties of at least $37,500 per day per violation under each of the 21 alleged theories of violation of environmental law, beginning on January 12, 2009 and potentially continuing until the present. *See* FAC at 20. The United States also sought injunctive relief designed to bring Defendant's Sanger facility into compliance with the CAA and its implementing regulations. The Court need not calculate the precise sum at issue in order to note that the amount in civil penalties sought by the United States, if fully obtained, would have been well beyond that which Gibson would ever have had the ability to pay.

Early in this litigation, Gibson emphasized its belief that the roughly $1.1 million sought, at the time, in civil penalties was dramatically higher than those sought in similar cases. *See* Doc. 21 at 13-14. In fact, "Gibson outlined seven other instances where the EPA, using the administrative enforcement process, obtained penalties for releases in amounts not exceeding $100,000.00" Doc. 21 at 13-14.[1]

B. The Consent Decree

The consent decree reached by the parties (1) imposes civil penalties in the amount of $330,000.00 to be paid of the period of two years, (2) creates a structured timeline for bringing Defendant's facility into compliance with applicable safety guidelines, (3) requires installation and continuous operation of a computer control system to monitor and control the anhydrous ammonia refrigeration system to be built pursuant to the safety specifications of the consent decree, (4) requires training of Defendant's employees to safely operate the system, (5) requires bi-annual reporting of compliance with the consent decree to the United States for the duration of the agreement, (6) imposes additional reporting requirements for the term of the consent decree, and (7) creates a enforcement mechanism for non-compliance with the terms of the consent decree, including stipulated penalties for any violations. Doc. 70-1. The improvements to the refrigeration system will cost approximately $300,000.00. Doc. 71-1 at 2.

///

///

---

[1] Gibson's exposition of penalties in similar cases was offered in support of its argument that the United States selectively enforced its authority.

3

C. Analysis: The Consent Decree is Reasonable, Fair, and Consistent with the Purposes of the Environmental Laws with which the EPA is Charged with Enforcement

The Court must assess the consent decree for procedural and substantive fairness. *City of Tucson*, 761 F.3d at 1011-1012; *City of Colton v. American Promotional Events, Inc.*, --- F.Supp.3d ----, 2017 WL 6811840, *2 (C.D. Cal. Dec. 5, 2017) (citing *Montrose*, 50 F.3d at 746). Procedurally, this action has been ongoing for roughly three years. The parties have actively engaged in discovery and motions practice regarding the sufficiency of the pleadings. Docs. 13, 32. The proposed consent decree was reached after good faith negotiations by Gibson and the United States. Doc. 71-1 at 4. The Court is satisfied with the procedural fairness of the proposed consent decree.

Next, the Court considers the substantive fairness of the proposed consent decree, with a focus on the purposes of the environmental laws, the strengths and weaknesses of the Plaintiff's case, the expense of further litigation, and the opinions of counsel. *City of Tucson*, 761 F.3d at 1012 (citing *Montrose*, 50 F.3d at 747).

The CAA is designed to, *inter alia*, "protect and enhance the quality of the Nation's air resources," 42 U.S.C. § 7401(b)(3), and reduce the risk of and minimize the consequences of accidental releases of hazardous substances," 42 U.S.C. § 7412(r)(1). The reporting requirements of CERCLA and EPCRA, the violation of which were alleged here, are designed to prevent damage to public health or welfare or the environment resulting from the release of hazardous substances by informing federal and local authorities. *See* 42 U.S.C. § 9602(a); 42 U.S.C. § 1104(b). The proposed consent decree is a clear effort by the EPA to achieve the purposes of the CAA, CERCLA, and EPCRA—the consent decree mandates implementation of additional safety requirements and heightened notice requirements, and imposes additional penalties for any failures to comply in either respect. That substantive consideration weighs in favor of approval of the consent decree.

Further, the Court would recognize the limited value of further litigation for both parties. In light of Defendant's financial limitations, the present consent decree spreads the burden of civil penalties out over the next two years. It is unlikely that a successful verdict against Gibson

by the United States would accomplish anything other than forcing Gibson's bankruptcy. Even assuming that the United States could theoretically recover at least $37,500.00 per day per violation of the CAA, CERCLA, and EPCRA—a question which the court does not now resolve—such a recovery would only be theoretically recoverable. More significantly, the machinery that allowed for the release at issue in this case may go unrepaired if litigation results in a large verdict against Gibson, forcing bankruptcy. By resolving this action by way of consent decree, the United States can impose non-negligible civil penalties, force Gibson to make improvements to its ammonia refrigeration system that will further the purposes of the CAA, CERCLA, and EPCRA, and save the unnecessary expenditure of additional governmental resources. Moreover, counsel for the United States, whose experience and position merit deference, indicate that the consent decree is reasonable, adequate, and serves the goals of the environmental laws that they are charged with enforcing.

The consent decree is reasonable, adequate and serves the goals of the CAA, CERCLA, and EPCRA.

### IV. Order

Based on the foregoing, IT IS HEREBY ORDERED that the consent decree lodged with this Court on January 29, 2018, Doc. 70-1, is ENTERED.

The Court retains jurisdiction over this action as set forth in Section XVIII of the consent decree. The Clerk of the Court is respectfully directed to close this case.

IT IS SO ORDERED.

Dated:   March 13, 2018  
_____  
SENIOR DISTRICT JUDGE