UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,

Plaintiff,

v.

GIBSON WINE CO.,

Defendant.

Civil No. 1:15-cv-01900-AWI-SKO

**CONSENT DECREE**

1

# TABLE OF CONTENTS

I.      JURISDICTION AND VENUE ...................................................................... 2
II.     APPLICABILITY ............................................................................................ 3
III.    DEFINITIONS ................................................................................................. 4
IV.     CIVIL PENALTY ............................................................................................ 5
V.      COMPLIANCE REQUIREMENTS ................................................................ 7
VI.     PERMITS ....................................................................................................... 12
VII.    REVIEW AND APPROVAL OF DELIVERABLES .................................... 12
VIII.   REPORTING REQUIREMENTS ................................................................. 13
IX.     STIPULATED PENALTIES ......................................................................... 15
X.      FORCE MAJEURE ....................................................................................... 18
XI.     DISPUTE RESOLUTION ............................................................................ 19
XII.    INFORMATION COLLECTION AND RETENTION ................................. 21
XIII.   EFFECT OF SETTLEMENT/RESERVATION OF RIGHTS ...................... 23
XIV.    COSTS ........................................................................................................... 25
XV.     NOTICES ....................................................................................................... 25
XVI.    CERTIFICATION ......................................................................................... 26
XVII.   EFFECTIVE DATE ....................................................................................... 26
XVIII.  RETENTION OF JURISDICTION .............................................................. 27
XIX.    MODIFICATION ........................................................................................... 27
XX.     TERMINATION ............................................................................................ 27
XXI.    PUBLIC PARTICIPATION .......................................................................... 28
XXII.   SIGNATORIES/SERVICE ........................................................................... 28
XXIII.  INTEGRATION ............................................................................................ 28
XXIV.   FINAL JUDGMENT ..................................................................................... 29
XXV.    APPENDICES ............................................................................................... 29

WHEREAS, Plaintiff United States of America, on behalf of the United States Environmental Protection Agency ("EPA"), filed the original complaint against Defendant Gibson Wine Company ("Defendant") on December 19, 2015, alleging claims under Section 112(r)(1) of the Clean Air Act, 42 U.S.C. § 7412(r)(1) ("CAA Section 112(r)(1)"), Section 103 of the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. § 9603 ("CERCLA Section 103"), and Section 304 and of the Emergency Planning and Community Right-To-Know Act, 42 U.S.C. § 11004 ("EPCRA Section 304"), with respect to Defendant's winemaking facility located at 1720 Academy Avenue, Sanger, California ("the Facility");

WHEREAS, on December 1, 2016, the United States filed an amended complaint adding a claim under Section 112(r)(7) of the Clean Air Act, 42 U.S.C. § 7412(r)(7) ("CAA Section 112(r)(7)"), based on the same conduct as previously pleaded for violations of CAA Section 112(r)(1), that was prompted by additional information, learned through review of documents produced by the Defendant, that the United States alleges supports the applicability of the regulations at 40 C.F.R. Part 68;

WHEREAS, the claims asserted by the United States stem from a release of at least 284 pounds of anhydrous ammonia on September 11, 2012, at the Facility that resulted in the death of a contract worker; anhydrous ammonia is a listed and regulated extremely hazardous substance under Section 112(r)(3) of the Clean Air Act, 42 U.S.C. § 7412(r)(3), and 40 C.F.R. § 68.130; anhydrous ammonia is also a hazardous substance for purposes of Section 102 of CERCLA, 42 U.S.C. § 9602, 40 C.F.R. § 302.4, Table 302.4, and for the purposes of Section 302 of EPCRA, 42 U.S.C. § 11002, 40 C.F.R. Part 355, Appendices A and B;

WHEREAS, Defendant admits that it is the owner and operator of a stationary source (the Facility) handling anhydrous ammonia;

WHEREAS, the United States alleges that CAA Section 112(r)(1) imposes a general duty of care on Defendant to identify hazards which may result from an accidental release of anhydrous ammonia, to design and maintain a safe facility to prevent accidental releases, and to minimize the consequences of any accidental release of anhydrous ammonia which does occur;

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

WHEREAS, the United States alleges claims under the notice provisions of CERCLA Section 103 and EPCRA Section 304 for Defendant's failure to notify the National Response Center until 37 hours after the Release and its failure to notify the California Office of Emergency Services at all;

WHEREAS, Defendant answered the amended complaint on April 5, 2017, and substantively denied the alleged violations;

WHEREAS, Defendant does not admit any liability to the United States arising out of the transactions or occurrences alleged in the amended complaint;

WHEREAS, the United States has reviewed financial information submitted by Defendant and determined that Defendant has a limited financial ability to pay the warranted civil penalty;

WHEREAS, the Parties recognize, and the Court by entering this Consent Decree finds, that this Consent Decree has been negotiated by the Parties in good faith and will avoid litigation between the Parties and that this Consent Decree is fair, reasonable, and in the public interest.

NOW, THEREFORE, without the adjudication or admission of any issue of fact or law except as provided in Section I below, in the Order Granting Motion to Strike Affirmative Defenses, dated April 25, 2016 (ECF No. 21), and in the Order Denying Motion to Strike Portions of First Amended Complaint, dated March 20, 2017 (ECF No. 54), and with the consent of the Parties, IT IS HEREBY ADJUDGED, ORDERED, AND DECREED as follows:

## I.    JURISDICTION AND VENUE

1.      This Court has jurisdiction over the subject matter of this action and the Defendant, pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), Section 109(c) of CERCLA, 42 U.S.C. § 9609(c), Section 325(b)(3) of EPCRA, 42 U.S.C. § 11045(b)(3), and under 28 U.S.C. §§ 1331, 1345, and 1355.  Venue is proper in this District under Section 113(b) of the CAA, 42 U.S.C. § 7413(b), Section 109(c) of CERCLA, 42 U.S.C. § 9609(c), Section 325(b)(3) of EPCRA, 42 U.S.C. § 11045(b)(3), and 28 U.S.C. §§ 1391(b) and (c), and 1395(a), because the Defendant does business in, and these claims arose within, this judicial district.  For

purposes of this Decree, or any action to enforce this Decree, Defendant consents to the Court's jurisdiction over this Decree and over Defendant, and consents to venue in this judicial district.

2.      For purposes of this Consent Decree, Defendant agrees that the amended complaint states claims upon which relief may be granted pursuant to CAA Sections 112(r)(1) and 112(r)(7), CERCLA Section 103, and EPCRA Section 304.

## II.      APPLICABILITY

3.      The obligations of this Consent Decree apply to and are binding upon the United States and upon Defendant and any successors, assigns, or other entities or persons otherwise bound by law.

4.      No transfer of ownership or operation of the Facility, whether in compliance with the procedures of this Paragraph or otherwise, shall relieve Defendant of its obligation to ensure that the terms of the Consent Decree are implemented.  At least 30 Days prior to such transfer, Defendant shall provide a copy of this Consent Decree to the proposed transferee and shall simultaneously provide written notice of the prospective transfer, together with a copy of the proposed written agreement, to EPA Region IX, and the United States Department of Justice, in accordance with Section XV (Notices).  Any attempt to transfer ownership or operation of the Facility without complying with this Paragraph constitutes a violation of this Decree.

5.      Defendant shall provide a copy of this Consent Decree to all officers, employees, and agents whose duties might reasonably include compliance with any provision of this Consent Decree, as well as to any contractor retained to perform work required under this Consent Decree.  Defendant shall condition any such contract upon performance of the work in conformity with the terms of this Consent Decree.

6.      In any action to enforce this Consent Decree, Defendant shall not raise as a defense the failure by any of its officers, directors, employees, agents, or contractors to take any actions necessary to comply with the provisions of this Consent Decree.

### III.    DEFINITIONS

7.    Terms used in this Consent Decree that are defined in CAA Section 112(r)(1), Clean Air Act 112(r)(7), CERCLA Section 103, or EPCRA Section 304 (collectively referred to as "the Statutes"), or in regulations promulgated pursuant to the Statutes, shall have the meanings assigned to them in the Statute(s) or such regulations, unless otherwise provided in this Decree. Whenever the terms set forth below are used in this Consent Decree, the following definitions shall apply:

a.    "Amended Complaint" shall mean the Amended Complaint filed by the United States on December 1, 2016, in this action;

b.    "Anhydrous Ammonia Refrigeration System" shall be all anhydrous ammonia refrigeration processes at the Facility, including all equipment comprising such systems including, but not limited to, condensers, compressors, receivers, chillers, valves, regulators, temperature and pressure gauges, pipes, and diffusion tanks;

c.    "Computer Control System" shall mean the computer control safety monitoring system for Gibson's Anhydrous Ammonia Refrigeration System as set forth in Paragraphs 14-21 of this Consent Decree.

d.    "Consent Decree" or "Decree" shall mean this Consent Decree and all appendices attached hereto, listed in Section XXV;

e.    "Continuous Operation" shall mean that the Computer Control System is turned on and functioning for its intended purpose any time that anhydrous ammonia is present in a process at the Facility;

f.    "Day" shall mean a calendar day unless expressly stated to be a business day.  In computing any period of time under this Consent Decree, where the last day would fall on a Saturday, Sunday, or federal holiday, the period shall run until the close of business of the next business day;

g.    "Defendant" shall mean Gibson Wine Company;

h.    "EPA" shall mean the United States Environmental Protection Agency and any of its successor departments or agencies;

4

i. "Effective Date" shall have the meaning provided in Section XVII;

j. "Facility" shall mean Defendant's winemaking facility located at 1720 Academy Avenue, Sanger, California;

k. "Financial Information" shall mean all documents and information of, or related to, Gibson's financial condition provided to the United States by Gibson or its agents, whether orally or in writing, before the date this Consent Decree has been signed by Gibson;

l. "Paragraph" shall mean a portion of this Decree identified by an Arabic numeral;

m. "Parties" shall mean the United States and Defendant;

n. "Section" shall mean a portion of this Decree identified by a roman numeral;

o. "United States" shall mean the United States of America, acting on behalf of EPA.

## IV. CIVIL PENALTY

8. Defendant shall pay the sum of $330,000 as a civil penalty as follows:

a. At 90 Days from Entry, $80,000 together with interest accruing on $330,000 from the date on which the Consent Decree is lodged with the Court, at the rate specified in 28 U.S.C. § 1961 as of the date of lodging;

b. At 365 Days from Entry, $90,000 together with interest accruing on $250,000 from due date for the payment required by Paragraph 8.a of this Consent Decree, at the rate specified in 28 U.S.C. § 1961 as of the date of lodging;

c. At 548 Days from Entry, $80,000 together with interest accruing on $160,000 from due date for the payment required by Paragraph 8.b of this Consent Decree at the rate specified in 28 U.S.C. § 1961 as of the date of lodging;

d. At 730 Days from Entry, $80,000 together with interest accruing on $80,000 from due date for the payment required by Paragraph 8.c of this Consent Decree, at the rate specified in 28 U.S.C. § 1961 as of the date of lodging.

e. If Defendant fails to make any installment payment required by Paragraphs 8.a-8.c by the required due date, all remaining installment payments and all accrued interest

1   shall become due immediately upon such failure.

2   9.   Defendant shall pay the civil penalty due by FedWire Electronic Funds Transfer

3   ("EFT") to the U.S. Department of Justice account, in accordance with instructions provided to

4   Defendant by the Financial Litigation Unit ("FLU") of the United States Attorney's Office for

5   the Eastern District of California after the Effective Date.  The payment instructions provided by

6   the FLU will include a Consolidated Debt Collection System ("CDCS") number, which

7   Defendant shall use to identify all payments required to be made in accordance with this Consent

8   Decree.  The FLU will provide the payment instructions to:

9       Eddie Wayne Albrecht, General Manager
10      Gibson Wine Company
        1720 Academy Avenue
11      Sanger, CA 93657
        (559) 875-2505 – Main
12      (559) 531-1407 – Direct
        walbrecht@gibsonwine.com
13

14   on behalf of Defendant.  Defendant may change the individual to receive payment instructions

15   on its behalf by providing written notice of such change to the United States and EPA in

16   accordance with Section XV (Notices).

17   10.   At the time of each payment, Defendant shall send notice that payment has been

18   made: (i) to EPA via email at cinwd_acctsreceivable@epa.gov or via regular mail at EPA

19   Cincinnati Finance Office, 26 W. Martin Luther King Drive, Cincinnati, Ohio 45268; (ii) to the

20   United States via email or regular mail in accordance with Section XV; and (iii) to EPA via

21   email in accordance with Section XV.  Such notice shall state that the payment is for the civil

22   penalty owed pursuant to the Consent Decree in *United States of America v. Gibson Wine Co.,*

23   *Case No. 1:15-cv-01900-AWI-SKO* and shall reference the civil action number, CDCS Number

24   and DOJ case number 90-11-3-11058.

25   11.   Defendant shall not deduct any penalties paid under this Decree pursuant to this

26   Section or Section IX (Stipulated Penalties) in calculating its federal income tax.

27

28

Consent Decree                           6
Case No. 1:15-cv-01900-AWI-SKO

## V.     COMPLIANCE REQUIREMENTS

12.     Until Termination (Section XX of this Consent Decree), Defendant shall comply with all applicable requirements of the Statutes, including the regulations under 40 C.F.R. Part 68, and with the California Accidental Release Prevention ("CalARP") Program, California Health and Safety Code Chapter 6.95, Article 2, Sections 25531-25543.3 and Title 19, Division 2, Chapter 4.5, Sections 2735-2785 of the California Code of Regulations.

**A.     Installation and Operation of Anhydrous Ammonia Refrigeration System Computer Control System.**

13.     No later than 365 days from the Effective Date, Defendant shall complete installation and commence Continuous Operation of a computer control system for its Anhydrous Ammonia Refrigeration System as set forth in Paragraphs 14-21 of this Consent Decree (the "Computer Control System").  The Computer Control System shall be in Continuous Operation through the date of Termination (Section XX) of this Consent Decree.

14.     The Computer Control System shall consist of the computer hardware, software and programming, and all components and equipment necessary to achieve the control of the Anhydrous Ammonia Refrigeration System pursuant to the specifications as described herein at Paragraphs 14-21, and substantially consistent with pertinent portions of the statement of work attached as Appendix A to this Consent Decree.

15.     The Computer Control System shall be connected to any and all anhydrous ammonia refrigeration equipment at the Facility, to include any condensers, compressors, receivers, chillers, valves, regulators, and temperature and pressure gauges in use at the Facility.

16.     The Computer Control System shall have at least the following components and functionality employed at all times of operation of the anhydrous ammonia refrigeration system:

a.     Remote viewing and control of the entire anhydrous ammonia refrigeration system, including changing set points, calibrating temperature and pressure, automated and remote temperature control, and automated and remote control of pressure regulators and/or motorized control valves to prevent a chiller from freezing;

b.     Automated alerts and alarms, both at the Facility and remotely, when parameters

for safe operation are exceeded;

c.      Automated shut-off of the ammonia feed to areas where either a release of anhydrous ammonia or a loss of pressure is detected;

d.      An uninterruptable power supply in case of power outage and to protect against power surges, which includes, but is not limited to, battery back-up;

e.      Programming to resume computer control following any manual override option, such that the Computer Control System will resume operation after one hour of having had a manual override triggered;

f.      An emergency refrigeration break-glass switch for emergency shutdown of ammonia refrigeration equipment, in accordance with the California Mechanical Code. The break-glass switch will be wired to the ammonia refrigeration system in such a way as to allow cutting all power to ammonia refrigeration equipment.

g.      An ammonia sensor and alarm system for each refrigeration process at the Facility, which shall include:

   (1)      A gas detection system for continuous monitoring of ammonia gas at levels of 0 to 500 ppm, with a means of reading the gas levels remotely in a location accessible to first responders;

   (2)      A local horn or horns that shall be audible throughout the Facility and strobe alerts visible in all areas of the Facility that shall be triggered for any detected anhydrous ammonia leak of at least 50 ppm;

   (3)      Automated remote notification to off-site personnel via email, text message, or other appropriate means; and,

   (4)      Tie-in to the computer system to provide for automatic shutdown of affected equipment.

h.      The software shall maintain time versus temperature graphs, expandable from five minutes to fourteen days, providing a history for daily monitoring and troubleshooting.

17.      Defendant shall assure technicians who operate and maintain the Anhydrous Ammonia Refrigeration System are qualified with refrigeration system engineering training to safely perform assigned tasks, including sufficient knowledge to interpret and apply reports generated by the Computer Control System.  Prior to commencing Continuous Operation of the

Computer Control System, Defendant shall specifically authorize technicians who are qualified to operate and maintain the Anhydrous Ammonia Refrigeration System using the Computer Control System.

18.    Within 90 days of completion of installation of the Computer Control System, Defendant shall prepare a schematic or diagram reflecting the new system that illustrates the locations of critical shut-off valves.  This schematic or diagram shall be incorporated into Defendant's Emergency Response (or Action) Plan and shall be kept readily accessible to first responders.

19.    Within 30 days of completion of installation of the Computer Control System but prior to its being placed into Continuous Operation, Defendant shall train all employees and contract workers at the Facility in the new instructions for reacting to the various types of alerts and alarms produced by the Computer Control System.  Within 90 days of completion of installation of the Computer Control System, Defendant's Emergency Response (or Action) Plan shall be updated to provide instructions for how to react to such alerts and alarms.

20.    Defendant shall follow and implement its management of change procedures, in compliance with applicable CalARP requirements, with respect to the design, installation, operation of and future changes to the Computer Control System.  Defendant shall also ensure that system Piping and Instrumentation Diagrams, maximum intended inventory calculations, and relief system calculations are updated accordingly.

21.    Defendant shall ensure that the Computer Control System is in material compliance with relevant industry standards.

**B.     Refrigeration Equipment Compliance Corrections**

22.    <u>Labeling and Tagging Refrigeration Equipment</u>:  Within 90 days of the Effective Date, Defendant shall ensure that all equipment, piping, and valves that are part of the Facility's Anhydrous Ammonia Refrigeration System are labeled, tagged, or otherwise identified consistent with the International Institute of Ammonia Refrigeration ("IIAR") Bulletin 114 (March 2014) and reflect the Facility's current piping and instrument diagrams.  At a minimum,

such labeling and tagging shall be completed for any outstanding items identified in any inspection report prepared for Gibson by any of its contractors.

23.     Replacing Refrigeration Gauges and Monitors: Within 90 days of the Effective Date, Gibson shall replace any broken or defective pressure or temperature gauges and monitors that will not otherwise be replaced as part of the Computer Control System project required by Paragraphs 13-21 of this Consent Decree.

24.     Completing a Mechanical Integrity Audit: Within 120 days of the Effective Date, Defendant shall notify EPA, in writing, of the name, address, and telephone number of the contractor selected to perform a Mechanical Integrity Audit of its anhydrous ammonia refrigeration equipment, subject to the review and approval of EPA.  The contractor shall have the technical expertise sufficient to comply with the applicable requirements of this Consent Decree.

25.     Within 180 days of the Effective Date, Defendant's qualified contractor shall complete a Mechanical Integrity Audit of Defendant's anhydrous ammonia refrigeration equipment, consistent with IIAR Bulletin No. 109, Section 5.3, and IIAR Bulletin No. 110, Section 6.4.4.  Within 30 days of completing this Mechanical Integrity Audit, Gibson shall submit to EPA a Mechanical Integrity Audit report that summarizes the audit; identifies the Anhydrous Ammonia Refrigeration System's conformance with accepted industry safety standards and governing codes, system deficiencies jeopardizing the safety of operating and other personnel, and operability and maintenance issues diminishing the useful life of the equipment; and sets forth recommendations for correcting deficiencies in order to mitigate or prevent accidental releases of anhydrous ammonia, with citations to the requirements or standards applicable to such deficiencies.  All such recommendations shall be implemented within 730 days from the Effective Date, in the order of priority identified through the audit.

26.     Relocating Process 2 King Valve: Within 365 days of the Effective Date, the king valve for Process 2 shall be moved to the location described in the statement of work attached as Appendix A to this Consent Decree at the section titled "Relocate Process #2 King Valve," and

as depicted in the picture therein, a readily accessible place where it would not be difficult to stop the flow of ammonia in an emergency.

27.    <u>Relocating Process 1 Equipment</u>: Within 730 days of the Effective Date, Defendant shall relocate the Chiller 11 and Chiller 13 anhydrous ammonia refrigeration system and all connected ammonia refrigeration equipment in Process 1, currently in the location near the employee break room and rest rooms in Building One, to the area described in the statement of work attached as Appendix A to this Consent Decree at the section titled "Relocate Chillers #11 & #13." Defendant shall follow and implement its management of changes procedures, in compliance with applicable CalARP requirements, with respect to the relocation of Process 1. Defendant shall also ensure that its Piping and Instrumentation Diagrams, maximum intended inventory calculations, and relief system calculations are updated accordingly.

28.    <u>Correcting Written Standard Operating Procedures</u>: Appendix B to this Consent Decree identifies deficiencies in Defendant's written "short form" standard operating procedures ("SOPs"). In addition to the specific deficiencies identified in Appendix B, the identified SOPs do not specify corrective actions required if conditions are outside appropriate limits. This omission is contrary to the recommendation in IIAR 7 (2013) at Section 6.2.1.1 and CalARP regulations 19 CCR §§ 2755.3(b)(7) and 2760.3(a)(2). Within 365 days of the Effective Date, Defendant shall submit to the EPA, for its review and approval, proposed corrections consistent with IIAR 7 (2013), "American National Standard for Developing Operating Procedures for Closed-Circuit Ammonia Mechanical Refrigerating Systems," and applicable CalARP requirements at 19 CCR §§ 2735-2785 to address the deficiencies identified in Appendix B; the proposed corrections shall also include revisions to any SOPs, including SOPs not enumerated in Appendix B, to include a cross-reference to any SOPs that identify required corrective actions to be taken when relevant operating conditions are outside of appropriate limits to enable operators to readily access such information. Upon approval by EPA, all such corrected SOPs shall supersede prior versions.

1

## VI.    PERMITS

2      29.     Where any compliance obligation under Section V requires Defendant to obtain a

3   federal, state, or local permit or approval, Defendant shall submit timely and complete

4   applications and take all other actions necessary to obtain all such permits or approvals.

5   Defendant may seek relief under the provisions of Section X (Force Majeure) for any delay in

6   the performance of any such obligation resulting from a failure to obtain, or a delay in obtaining,

7   any permit or approval required to fulfill such obligation, if Defendant has submitted timely and

8   complete applications and has taken all other actions necessary to obtain all such permits or

9   approvals.

10   ## VII.    REVIEW AND APPROVAL OF DELIVERABLES

11      30.     After review of any plan, report, or other item that is required to be submitted

12   pursuant to this Consent Decree, EPA shall in writing: (a) approve the submission; (b) approve

13   the submission upon specified conditions; (c) approve part of the submission and disapprove the

14   remainder; or (d) disapprove the submission.

15      31.     If the submission is approved pursuant to Paragraph 30, Defendant shall take all

16   actions required by the plan, report, or other document, in accordance with the schedules and

17   requirements of the plan, report, or other document, as approved.  If the submission is

18   conditionally approved or approved only in part pursuant to Paragraph 30(b) or (c), Defendant

19   shall, upon written direction from EPA take all actions required by the approved plan, report, or

20   other item that EPA determines are technically severable from any disapproved portions, subject

21   to Defendant's right to dispute only the specified conditions or the disapproved portions, under

22   Section XI (Dispute Resolution).

23      32.     If the submission is disapproved in whole or in part pursuant to Paragraph 30(c)

24   or (d), Defendant shall, within 45 days or such other time as the Parties agree to in writing,

25   correct all deficiencies and resubmit the plan, report, or other item, or disapproved portion

26   thereof, for approval, in accordance with the preceding Paragraphs.  If the resubmission is

27   approved in whole or in part, Defendant shall proceed in accordance with the preceding

28   Paragraph.

33.     If a resubmitted plan, report, or other item, or portion thereof, is disapproved in whole or in part, EPA may again require Defendant to correct any deficiencies, in accordance with the preceding Paragraphs, subject to Defendant's right to invoke Dispute Resolution and the right of EPA to seek stipulated penalties as provided in the preceding Paragraphs.

34.     Any stipulated penalties applicable to the original submission, as provided in Section IX, shall accrue during the 45 day period or other specified period, but shall not be payable unless the resubmission is untimely or is disapproved in whole or in part; provided that, if the original submission was so deficient as to constitute a material breach of Defendant's obligations under this Decree, the stipulated penalties applicable to the original submission shall be due and payable notwithstanding any subsequent resubmission.

## VIII.   REPORTING REQUIREMENTS

35.     Defendant shall submit the following reports: By July 31st and January 31st of each year after the Effective Date of this Consent Decree, and until termination of this Decree pursuant to Section XX, Defendant shall submit by email and U.S. Mail a semiannual report to U.S. EPA for the preceding six months ending on June 30 and December 31, as provided in the Notices Section XV, that shall report on the status of all compliance requirements as set forth in Paragraphs 8 through 29 above, including completion of milestones, problems encountered or anticipated, together with implemented or proposed solutions.

36.     Each report submitted pursuant to Paragraph 35 of this Consent Decree shall include a description of any non-compliance with the requirements of this Consent Decree and an explanation of the violation's likely cause and of the remedial steps taken, or to be taken, to prevent or minimize such violation.  If Defendant violates, or has reason to believe that it may violate, any requirement of this Consent Decree, Defendant shall notify the United States of such violation and its likely duration, in writing, within ten working Days of the Day Defendant first becomes aware of the violation, with an explanation of the violation's likely cause and of the remedial steps taken, or to be taken, to prevent or minimize such violation.  If the cause of a violation cannot be fully explained at the time the report is due, Defendant shall so state in the report.  Defendant shall investigate the cause of the violation and shall then submit an

amendment to the report, including a full explanation of the cause of the violation, within 30 Days of the Day Defendant becomes aware of the cause of the violation.  Nothing in this Paragraph or the following Paragraph relieves Defendant of its obligation to provide the notice required by Section X (Force Majeure).

37.     Whenever any violation of this Consent Decree or any other event affecting Defendant's performance under this Decree, or the performance of its Facility, may pose an immediate threat to the public health or welfare or the environment, Defendant shall notify EPA orally or by electronic or facsimile transmission as soon as possible, but no later than 24 hours after Defendant first knew of the violation or event.  This procedure is in addition to the requirements set forth in the preceding Paragraph and the reporting requirements of CERCLA Section 103 and EPCRA Section 304 or of any other law.

38.     All reports shall be submitted to the persons designated in Section XV (Notices).

39.     Each report submitted by Defendant under this Section shall be signed by an official of the submitting party and include the following certification:

> I certify under penalty of law that this document and all attachments were prepared under my direction or supervision in accordance with a system designed to assure that qualified personnel properly gather and evaluate the information submitted.  Based on my inquiry of the person or persons who manage the system, or those persons directly responsible for gathering the information, the information submitted is, to the best of my knowledge and belief, true, accurate, and complete.  I have no personal knowledge that the information submitted is other than true, accurate, and complete.  I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment for knowing violations.

40.     This certification requirement does not apply to emergency or similar notifications where compliance would be impractical.

41.     The reporting requirements of this Consent Decree do not relieve Defendant of any reporting obligations required by the Act or implementing regulations, or by any other federal, state, or local law, regulation, permit, or other requirement.

42.     Any information provided pursuant to this Consent Decree may be used by the United States in any proceeding to enforce the provisions of this Consent Decree and as otherwise permitted by law.

Consent Decree                                    14
Case No. 1:15-cv-01900-AWI-SKO

# IX.   STIPULATED PENALTIES

43.   Defendant shall be liable for stipulated penalties to the United States for violations of this Consent Decree as specified in Table 1 below, unless excused under Section X (Force Majeure).  A violation includes failing to perform any obligation required by the terms of this Decree, including any work plan or schedule approved under this Decree, according to all applicable requirements of this Decree and within the specified time schedules established by or approved under this Decree.

**Table 1**

| Consent Decree Violation | Stipulated Penalty |
|---|---|
| a. Failure to pay the civil penalty in the amounts required and on the dates specified in Paragraphs 8.a-d of this Consent Decree. | $1,000 for each Day. |
| b. Failure to complete installation, and commence continuous operation, of the Computer Control System project required by Paragraphs 13-21 within 365 days of the Effective Date of this Consent Decree. | $500    1st through 14th day;<br>$1,000 15th through 30th day;<br>$1,500 31st day and beyond. |
| c. Failure to:<br><br>• Complete labeling and tagging of anhydrous ammonia refrigeration system required by Paragraph 22 within 90 days of the Effective Date of this Consent Decree.<br><br>• Replace broken or defective pressure or temperature gauges and monitors required by Paragraph 23 within 90 days of the Effective Date of this Consent Decree.<br><br>• Relocate Process 2 king valve required by Paragraph 26 within 365 days of the Effective Date of this Consent Decree | For each violation:<br>$100    1st through 14th day;<br>$250    15th through 30th day;<br>$500    31st day and beyond. |

Consent Decree
Case No. 1:15-cv-01900-AWI-SKO

15

| | |
|---|---|
| d. Failure to:<br><br>• Have a Mechanical Integrity Audit completed as required by Paragraphs 24 and 25 within 180 days of the Effective Date of this Consent Decree.<br><br>• Implement all recommendations made in Mechanical Integrity Audit Report within 730 days of the Effective Date, as required by Paragraph 25 of this Consent Decree. | For each violation:<br>$500    1st through 14th day;<br>$1,000 15th through 30th day;<br>$1,500 31st day and beyond. |
| e. Failure to relocate Chiller 11 and 13 process equipment within 730 days of the Effective Date, as required by Paragraph 27 of this Consent Decree. | $500    1st through 14th day;<br>$1,000 15th through 30th day;<br>$1,500 31st day and beyond. |
| f. Failure to submit to EPA revised written SOPs within 365 days of the Effective Date, as required by Paragraph 28 of this Consent Decree. | $100    1st through 14th day;<br>$250    15th through 30th day;<br>$500    31st day and beyond. |
| g. Failure to timely submit, modify, or implement, as approved, a report, plan, study, analysis, protocol, or other submittal required by this Consent Decree. | $250 for the 1st through 14th day;<br>$500 for the 15th through 30th day;<br>$750 for the 31st day and beyond. |
| h. Any violation of this Consent Decree not covered elsewhere in this Table 1. | $500 for each Day for each violation. |

44.     Stipulated penalties under this Section shall begin to accrue on the Day after performance is due or on the Day a violation occurs, whichever is applicable, and shall continue to accrue until performance is satisfactorily completed or until the violation ceases.  Stipulated penalties shall accrue simultaneously for separate violations of this Consent Decree.

45.     Defendant shall pay any stipulated penalty within 30 Days of receiving the United States' written demand.

46.     The United States may in the unreviewable exercise of its discretion, reduce or waive stipulated penalties otherwise due it under this Consent Decree.

47.     Stipulated penalties shall continue to accrue as provided in Paragraph 44, during any Dispute Resolution, but need not be paid until the following:

a.     If the dispute is resolved by agreement of the Parties or by a decision of EPA that is not appealed to the Court, Defendant shall pay accrued penalties determined to be owing, together with interest, to the United States within 30 Days of the effective date of the agreement or the receipt of EPA's decision or order.

b.     If the dispute is appealed to the Court and the United States prevails in whole or in part, Defendant shall pay all accrued penalties determined by the Court to be owing, together with interest, within 60 Days of receiving the Court's decision or order, except as provided in subparagraph c, below.

c.     If any Party appeals the District Court's decision, Defendant shall pay all accrued penalties determined to be owing, together with interest, within 15 Days of receiving the final appellate court decision.

48.     Defendant shall pay stipulated penalties owing to the United States in the manner set forth and with the confirmation notices required by Paragraphs 9 and 10, except that the transmittal letter shall state that the payment is for stipulated penalties and shall state for which violation(s) the penalties are being paid.

49.     If Defendant fails to pay stipulated penalties according to the terms of this Consent Decree, Defendant shall be liable for interest on such penalties, as provided for in 28 U.S.C. § 1961, accruing as of the date payment became due.  Nothing in this Paragraph shall be construed to limit the United States from seeking any remedy otherwise provided by law for Defendant's failure to pay any stipulated penalties.

50.     The payment of penalties and interest, if any, shall not alter in any way Defendant's obligation to complete the performance of the requirements of this Consent Decree.

51.     Non-Exclusivity of Remedy.  Stipulated penalties are not the United States' exclusive remedy for violations of this Consent Decree.  Subject to the provisions of Section XIII (Effect of Settlement/Reservation of Rights), the United States expressly reserves the right to seek any other relief it deems appropriate for Defendant's violation of this Decree or applicable

law, including but not limited to an action against Defendant for statutory penalties, additional injunctive relief, mitigation or offset measures, and/or contempt.  However, the amount of any statutory penalty assessed for a violation of this Consent Decree shall be reduced by an amount equal to the amount of any stipulated penalty assessed and paid pursuant to this Consent Decree.

## X.    FORCE MAJEURE

52.    "Force majeure," for purposes of this Consent Decree, is defined as any event arising from causes beyond the control of Defendant, of any entity controlled by Defendant, or of Defendant's contractors, that delays or prevents the performance of any obligation under this Consent Decree despite Defendant's best efforts to fulfill the obligation.  The requirement that Defendant exercise "best efforts to fulfill the obligation" includes using best efforts to anticipate any potential force majeure event and best efforts to address the effects of any potential force majeure event (a) as it is occurring and (b) following the potential force majeure, such that the delay and any adverse effects of the delay are minimized.  "Force Majeure" does not include Defendant's financial inability to perform any obligation under this Consent Decree.

53.    If any event occurs or has occurred that may delay the performance of any obligation under this Consent Decree, whether or not caused by a force majeure event, Defendant shall provide notice orally or by electronic or facsimile transmission to EPA, in accordance with Section XV of this Consent Decree (Notices), within 72 hours of when Defendant first knew that the event might cause a delay.  Within seven days thereafter, Defendant shall provide in writing to EPA an explanation and description of the reasons for the delay; the anticipated duration of the delay; all actions taken or to be taken to prevent or minimize the delay; a schedule for implementation of any measures to be taken to prevent or mitigate the delay or the effect of the delay; Defendant's rationale for attributing such delay to a force majeure event if it intends to assert such a claim; and a statement as to whether, in the opinion of Defendant, such event may cause or contribute to an endangerment to public health, welfare or the environment.  Defendant shall include with any notice all available documentation supporting the claim that the delay was attributable to a force majeure.  Failure to comply with the above requirements shall preclude Defendant from asserting any claim of force majeure for that event for the period of time of such

failure to comply, and for any additional delay caused by such failure. Defendant shall be deemed to know of any circumstance of which Defendant, any entity controlled by Defendant, or Defendant's contractors knew or should have known.

54.     If EPA agrees that the delay or anticipated delay is attributable to a force majeure event, the time for performance of the obligations under this Consent Decree that are affected by the force majeure event will be extended by EPA for such time as is necessary to complete those obligations. An extension of the time for performance of the obligations affected by the force majeure event shall not, of itself, extend the time for performance of any other obligation. EPA will notify Defendant in writing of the length of the extension, if any, for performance of the obligations affected by the force majeure event.

55.     If EPA does not agree that the delay or anticipated delay has been or will be caused by a force majeure event, EPA will notify Defendant in writing of its decision.

56.     If Defendant elects to invoke the dispute resolution procedures set forth in Section XI (Dispute Resolution), it shall do so no later than 15 days after receipt of EPA's notice. In any such proceeding, Defendant shall have the burden of demonstrating by a preponderance of the evidence that the delay or anticipated delay has been or will be caused by a force majeure event, that the duration of the delay or the extension sought was or will be warranted under the circumstances, that best efforts were exercised to avoid and mitigate the effects of the delay, and that Defendant complied with the requirements of Paragraphs 56 and 57. If Defendant carries this burden, the delay at issue shall be deemed not to be a violation by Defendant of the affected obligation of this Consent Decree identified to EPA and the Court.

## XI.     DISPUTE RESOLUTION

57.     Unless otherwise expressly provided for in this Consent Decree, the dispute resolution procedures of this Section shall be the exclusive mechanism to resolve disputes arising under or with respect to this Consent Decree. Defendant's failure to seek resolution of a dispute under this Section shall preclude Defendant from raising any such issue as a defense to an action by the United States to enforce any obligation of Defendant arising under this Decree.

58.     Informal Dispute Resolution.  Any dispute subject to Dispute Resolution under this Consent Decree shall first be the subject of informal negotiations.  The dispute shall be considered to have arisen when Defendant sends the United States a written Notice of Dispute.  Such Notice of Dispute shall state clearly the matter in dispute.  The period of informal negotiations shall not exceed 20 Days from the date the dispute arises, unless that period is modified by written agreement.  If the Parties cannot resolve a dispute by informal negotiations, then the position advanced by the United States shall be considered binding unless, within 15 Days after the conclusion of the informal negotiation period, Defendant invokes formal dispute resolution procedures as set forth below.

59.     Formal Dispute Resolution.  Defendant shall invoke formal dispute resolution procedures, within the time period provided in the preceding Paragraph, by serving on the United States a written Statement of Position regarding the matter in dispute.  The Statement of Position shall include, but need not be limited to, any factual data, analysis, or opinion supporting Defendant's position and any supporting documentation relied upon by Defendant.

60.     The United States shall serve its Statement of Position within 45 Days of receipt of Defendant's Statement of Position.  The United States' Statement of Position shall include, but need not be limited to, any factual data, analysis, or opinion supporting that position and any supporting documentation relied upon by the United States.  The United States' Statement of Position shall be binding on Defendant, unless Defendant files a motion for judicial review of the dispute in accordance with the following Paragraph.

61.     Defendant may seek judicial review of the dispute by filing with the Court and serving on the United States, in accordance with Section XV (Notices), a motion requesting judicial resolution of the dispute.  The motion must be filed within ten Days of receipt of the United States' Statement of Position pursuant to the preceding Paragraph.  The motion shall contain a written statement of Defendant's position on the matter in dispute, including any supporting factual data, analysis, opinion, or documentation, and shall set forth the relief requested and any schedule within which the dispute must be resolved for orderly implementation of the Consent Decree.

Consent Decree
Case No. 1:15-cv-01900-AWI-SKO

20

62.     The United States shall respond to Defendant's motion within the time period allowed by the Local Rules of this Court.  Defendant may file a reply memorandum, to the extent permitted by the Local Rules.

63.     Standard of Review

a.      <u>Disputes Concerning Matters Accorded Record Review</u>.  Except as otherwise provided in this Consent Decree, in any dispute brought under Paragraph 59 pertaining to the adequacy or appropriateness of plans, procedures to implement plans, schedules or any other items requiring approval by EPA under this Consent Decree; the adequacy of the performance of work undertaken pursuant to this Consent Decree; and all other disputes that are accorded review on the administrative record under applicable principles of administrative law, Defendant shall have the burden of demonstrating, based on the administrative record, that the position of the United States is arbitrary and capricious or otherwise not in accordance with law.

b.      <u>Other Disputes</u>.  Except as otherwise provided in this Consent Decree, in any other dispute brought under Paragraph 59, Defendant shall bear the burden of demonstrating that its position complies with this Consent Decree.

64.     The invocation of dispute resolution procedures under this Section shall not, by itself, extend, postpone, or affect in any way any obligation of Defendant under this Consent Decree, unless and until final resolution of the dispute so provides.  Stipulated penalties with respect to the disputed matter shall continue to accrue from the first Day of noncompliance, but payment shall be stayed pending resolution of the dispute as provided in Paragraph 47.  If Defendant does not prevail on the disputed issue, stipulated penalties shall be assessed and paid as provided in Section IX (Stipulated Penalties).

## XII.    INFORMATION COLLECTION AND RETENTION

65.     The United States and its representatives, including attorneys, contractors, and consultants, shall have the right of entry into any facility covered by this Consent Decree, at all reasonable times, upon presentation of credentials, to:

a.      monitor the progress of activities required under this Consent Decree;

b.      verify any data or information submitted to the United States in accordance with the terms of this Consent Decree;

c.      obtain samples and, upon request, splits of any samples taken by Defendant or its representatives, contractors, or consultants;

d.      obtain documentary evidence, including photographs and similar data; and,

e.      assess Defendant's compliance with this Consent Decree.

66.     Until five years after the termination of this Consent Decree, Defendant shall retain, and shall instruct its contractors and agents to preserve, all non-identical copies of all documents, records, or other information (including documents, records, or other information in electronic form) in its or its contractors' or agents' possession or control, or that come into its or its contractors' or agents' possession or control, and that relate in any manner to Defendant's performance of its obligations under this Consent Decree. This information-retention requirement expressly applies to all forms of electronically stored information, including email and any data generated by the Computer Control System. This information-retention requirement shall apply regardless of any contrary corporate or institutional policies or procedures. At any time during this information-retention period, upon request by the United States, Defendant shall provide copies of any documents, records, or other information required to be maintained under this Paragraph.

67.     At the conclusion of the information-retention period provided in the preceding Paragraph, Defendant shall notify the United States at least 90 Days prior to the destruction of any documents, records, or other information subject to the requirements of the preceding Paragraph and, upon request by the United States, Defendant shall deliver any such documents, records, or other information to EPA. Defendant may assert that certain documents, records, or other information is privileged under the attorney-client privilege or any other privilege recognized by federal law. If Defendant asserts such a privilege, it shall provide the following: (a) the title of the document, record, or information; (b) the date of the document, record, or information; (c) the name and title of each author of the document, record, or information; (d) the name and title of each addressee and recipient; (e) a description of the subject of the document,

record, or information; and (f) the privilege asserted by Defendant.  However, no documents, records, or other information created or generated pursuant to the requirements of this Consent Decree shall be withheld on grounds of privilege.

68.     Defendant may also assert that information required to be provided under this Section is protected as Confidential Business Information ("CBI") under 40 C.F.R. Part 2.  As to any information that Defendant seeks to protect as CBI, Defendant shall follow the procedures set forth in 40 C.F.R. Part 2.

69.     This Consent Decree in no way limits or affects any right of entry and inspection, or any right to obtain information, held by the United States pursuant to applicable federal laws, regulations, or permits, nor does it limit or affect any duty or obligation of Defendant to maintain documents, records, or other information imposed by applicable federal or state laws, regulations, or permits.

### XIII.   EFFECT OF SETTLEMENT/RESERVATION OF RIGHTS

70.     This Consent Decree resolves the civil claims of the United States for the violations alleged in the amended complaint filed in this action through the date of lodging.

71.     The United States reserves all legal and equitable remedies available to enforce the provisions of this Consent Decree.  This Consent Decree shall not be construed to limit the rights of the United States to obtain penalties or injunctive relief under the Statutes or implementing regulations, or under other federal laws, regulations, or permit conditions.  The United States further reserves all legal and equitable remedies to address any imminent and substantial endangerment to the public health or welfare or the environment arising at, or posed by, Defendant's Facility, whether related to the violations addressed in this Consent Decree or otherwise.

72.     Notwithstanding any other provision of this Settlement Agreement, if the Financial Information provided by Defendant, or the financial certification contained in Paragraph 81 of this Consent Decree made by the Defendant in signing this Consent Decree, is subsequently determined by the United States to be, in any material respect, false or inaccurate, Defendant shall forfeit all payments made pursuant to this Consent Decree, and the resolution of

liability provided by Paragraph 70 shall be null and void.  Such forfeiture shall not constitute liquidated damages and shall not in any way foreclose the United States' right to pursue any other causes of action arising from Defendant's materially false or inaccurate information.

73.     In any subsequent administrative or judicial proceeding initiated by the United States for injunctive relief, civil penalties, other appropriate relief relating to the Facility or Defendant's violations, Defendant shall not assert, and may not maintain, any defense or claim based upon the principles of waiver, res judicata, collateral estoppel, issue preclusion, claim preclusion, claim-splitting, or other defenses based upon any contention that the claims raised by the United States in the subsequent proceeding were or should have been brought in the instant case, except with respect to claims that have been specifically resolved pursuant to Paragraph 70.

74.     This Consent Decree is not a permit, or a modification of any permit, under any federal, State, or local laws or regulations.  Defendant is responsible for achieving and maintaining complete compliance with all applicable federal, State, and local laws, regulations, and permits; and Defendant's compliance with this Consent Decree shall be no defense to any action commenced pursuant to any such laws, regulations, or permits, except as set forth herein. The United States does not, by its consent to the entry of this Consent Decree, warrant or aver in any manner that Defendant's compliance with any aspect of this Consent Decree will result in compliance with provisions of CAA Section 112(r)(1); CAA Section 112 (r)(7); CERCLA Section 103; EPCRA Section 304, or with any other provisions of federal, State, or local laws, regulations, or permits.

75.     This Consent Decree does not limit or affect the rights of Defendant or of the United States against any third parties, not party to this Consent Decree, nor does it limit the rights of third parties, not party to this Consent Decree, against Defendant, except as otherwise provided by law.

76.     This Consent Decree shall not be construed to create rights in, or grant any cause of action to, any third party not party to this Consent Decree.

# XIV.   COSTS

77.     The Parties shall bear their own costs of this action, including attorneys' fees, except that the United States shall be entitled to collect the costs (including attorneys' fees) incurred in any action necessary to collect any portion of the civil penalty or any stipulated penalties due but not paid by Defendant.

# XV.   NOTICES

78.     Unless otherwise specified in this Decree, whenever notifications, submissions, or communications are required by this Consent Decree, they shall be made in writing and addressed as follows:

| | |
|---|---|
| As to the United States by email: | eescdcopy.enrd@usdoj.gov<br>Re: DJ # 90-11-3-11058 |
| As to the United States by mail: | EES Case Management Unit<br>Environment and Natural Resources Division<br>U.S. Department of Justice<br>P.O. Box 7611<br>Washington, D.C.  20044-7611<br>Re: DJ # 90-11-3-11058 |
| As to EPA: | Jeremy Johnstone<br>U.S. Environmental Protection Agency Region IX<br>75 Hawthorne St<br>San Francisco, CA  94105<br>Phone: 415-972-3499<br>Email: johnstone.jeremy@epa.gov |
| As to Defendant: | Eddie Wayne Albrecht, General Manager<br>Gibson Wine Company<br>1720 Academy Avenue<br>Sanger, CA 93657<br>Phone: 559-875-2505<br>Email: walbrecht@gibsonwine.com |

79.     Any Party may, by written notice to the other Parties, change its designated notice recipient or notice address provided above.

Consent Decree
Case No. 1:15-cv-01900-AWI-SKO

25

80.     Notices submitted pursuant to this Section shall be deemed submitted upon mailing, unless otherwise provided in this Consent Decree or by mutual agreement of the Parties in writing.

## XVI.   CERTIFICATION

81.     Defendant hereby certifies that, to the best of its knowledge and belief, after thorough inquiry, it has: (a) submitted to the United States Financial Information that fairly, accurately and materially set forth its financial circumstances, and that those circumstances have not materially changed between the time the Financial Information was submitted to the United States and the time the Defendant executes this Consent Decree; and (b) fully disclosed the existence of any insurance policies that may cover claims relating to the civil claims being resolved in this Consent Decree.  Defendant also expressly certifies the following with respect to its Facility: 1) all piping system openings, except the relief header, have been plugged or capped, or that the valve controlling the opening is locked; 2) all of its atmospheric pressure relief valves have been replaced within the last five years; 3) the Facility's Hazardous Materials Business Plan Chemical Inventory reporting is up to date; 4) written procedures governing the proper use and care of personal protective equipment are in place and that employees are being trained using those written procedures; 5) all personnel authorized to use the ammonia respirator know its location, and the ammonia respirator is inspected and maintained per manufacturer or industry standards; 6) the eyewash stations and safety showers are tested and maintained in accordance with the manufacturer's instructions for the specific equipment installed at the Facility; and 7) none of Defendant's refrigeration processes contain, or shall, as a result of any modifications required by this Consent Decree, contain 10,000 pounds or more of anhydrous ammonia.

## XVII.  EFFECTIVE DATE

82.     The Effective Date of this Consent Decree shall be the date upon which this Consent Decree is entered by the Court or a motion to enter the Consent Decree is granted, whichever occurs first as recorded on the Court's docket.

## XVIII.   RETENTION OF JURISDICTION

83.     The Court shall retain jurisdiction over this case until termination of this Consent Decree, for the purpose of resolving disputes arising under this Decree or entering orders modifying this Decree, pursuant to Sections XI and XIX, or effectuating or enforcing compliance with the terms of this Decree.

## XIX.   MODIFICATION

84.     The terms of this Consent Decree, including any attached appendices, may be modified only by a subsequent written agreement signed by all the Parties.  Where the modification constitutes a material change to this Decree, it shall be effective only upon approval by the Court.

85.     Any disputes concerning modification of this Decree shall be resolved pursuant to Section XI (Dispute Resolution), provided, however, that, instead of the burden of proof provided by Paragraph 63, the Party seeking the modification bears the burden of demonstrating that it is entitled to the requested modification in accordance with Federal Rule of Civil Procedure 60(b).

## XX.   TERMINATION

86.     After Defendant has completed the requirements of Section V (Compliance Requirements), and has paid the civil penalty and any accrued stipulated penalties as required by this Consent Decree, Defendant may serve upon the United States a Request for Termination, stating that Defendant has satisfied those requirements, together with all necessary supporting documentation.

87.     Following receipt by the United States of Defendant's Request for Termination, the Parties shall confer informally concerning the Request and any disagreement that the Parties may have as to whether Defendant has satisfactorily complied with the requirements for termination of this Consent Decree.  If the United States agrees that the Decree may be terminated, the Parties shall submit, for the Court's approval, a joint stipulation terminating the Decree.

88.     If the United States does not agree that the Decree may be terminated, Defendant may invoke Dispute Resolution under Section XI.  However, Defendant shall not seek Dispute Resolution of any dispute regarding termination until after service of its Request for Termination.

## XXI.   PUBLIC PARTICIPATION

89.     This Consent Decree shall be lodged with the Court for a period of not less than 30 Days for public notice and comment in accordance with 28 C.F.R. § 50.7.  The United States reserves the right to withdraw or withhold its consent if the comments regarding the Consent Decree disclose facts or considerations indicating that the Consent Decree is inappropriate, improper, or inadequate.  Defendant consents to entry of this Consent Decree without further notice and agrees not to withdraw from or oppose entry of this Consent Decree by the Court or to challenge any provision of the Decree, unless the United States has notified Defendant in writing that it no longer supports entry of the Decree.

## XXII.   SIGNATORIES/SERVICE

90.     Each undersigned representative of Defendant and the Acting Assistant Attorney General for the Environment and Natural Resources Division of the Department of Justice certifies that he or she is fully authorized to enter into the terms and conditions of this Consent Decree and to execute and legally bind the Party he or she represents to this document.

91.     This Consent Decree may be signed in counterparts, and its validity shall not be challenged on that basis.  Defendant agrees to accept service of process by mail with respect to all matters arising under or relating to this Consent Decree and to waive the formal service requirements set forth in Rules 4 and 5 of the Federal Rules of Civil Procedure and any applicable Local Rules of this Court including, but not limited to, service of a summons.

## XXIII.   INTEGRATION

92.     This Consent Decree constitutes the final, complete, and exclusive agreement and understanding among the Parties with respect to the settlement embodied in the Decree and supersedes all prior agreements and understandings, whether oral or written, concerning the settlement embodied herein.  Other than deliverables that are subsequently submitted and

approved pursuant to this Decree, the Parties acknowledge that there are no representations, agreements, or understandings relating to the settlement other than those expressly contained in this Consent Decree.

## XXIV.  FINAL JUDGMENT

93.     Upon approval and entry of this Consent Decree by the Court, this Consent Decree shall constitute a final judgment of the Court as to the United States and Defendant.

## XXV.  APPENDICES

94.     The following Appendices are attached to and part of this Consent Decree:

"Appendix A" is the Facility Controls Retrofit & Safety Improvements Statement of Work;

"Appendix B" is the Written SOP Deficiencies To Correct.

IT IS SO ORDERED.

Dated:   March 13, 2018

_____
SENIOR  DISTRICT  JUDGE

1    FOR THE UNITED STATES OF AMERICA:

2

3    _1/17/18_____

4    DATE                              JEFFREY H. WOOD
                                       Acting Assistant Attorney General
5                                      Environment and Natural Resources Division
6                                      U.S. Department of Justice

7

8

9                                      ANDREW W. INGERSOLL
                                       Environmental Enforcement Section
10                                     Environment and Natural Resources Division
                                       U.S. Department of Justice
11                                     P.O. Box 7611
12                                     Washington, DC 20044-7611
                                       Telephone: (202) 514-1999
13                                     andrew.ingersoll@usdoj.gov

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FOR THE U.S. ENVIRONMENTAL PROTECTION
AGENCY:


_____ 22/an. 2018

ALEXIS STRAUSS
Acting Regional Administrator
U.S. Environmental Protection Agency, Region 9


_____

SYLVIA QUAST
Regional Counsel
U.S. Environmental Protection Agency, Region 9


_____

MADELINE A. GALLO
Assistant Regional Counsel
U.S. Environmental Protection Agency, Region 9
Office of Regional Counsel

Consent Decree
Case No. 1:15-cv-01900-AWI-SKO

31

1

2                                        FOR GIBSON WINE COMPANY:

3

4    _12-21-17_
     DATE                                EDDIE WAYNE ALBRECHT

5                                        General Manager
                                         Gibson Wine Company

6

7

8                                        JUSTIN CAMPAGNE
                                         Campagne & Campagne

9

10                                       As to Form:

11

12                                       JAMES T. DUFOUR

13                                       Dufour Law

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FOR GIBSON WINE COMPANY:

_____          _____
DATE                             EDDIE WAYNE ALBRECHT
                                 General Manager
                                 Gibson Wine Company


                                 _____
                                 JUSTIN CAMPAGNE
                                 Campagne & Campagne

                                 As to Form:

                                 _____
                                 JAMES T. DUFOUR
                                 Dufour Law

Consent Decree                        32
Case No. 1:15-cv-01900-AWI-SKO

**APPENDIX A – FACILITY CONTROLS RETROFIT & SAFETY IMPROVEMENTS STATEMENT OF WORK**

1.      This Statement of Work ("SOW") describes a retrofit and upgrade of the anhydrous ammonia refrigeration and refrigeration controls systems and interconnection of the controls system to provide system operators communication with the Facility's entire refrigeration system, including alerts to alarm conditions from all areas and ammonia vapor detection.  In addition to the alerts, the new controls system will be set up to automatically shut off ammonia feed to areas where a leak is detected.  This SOW also describes the decommissioning of Process #1 and relocation of Chillers #11 & #13 to where they can be tied into Process #4, and moving the King Valve for Process #2 to a more accessible location.  This SOW is designed to assist Gibson in complying with the requirements of this Consent Decree and shall not be read to supersede the express terms of the Consent Decree, but to supplement those requirements.  If a provision of this SOW conflicts with a provision of the Consent Decree, the Consent Decree shall govern.

2.      The work to be undertaken pursuant to this SOW relates to the following subsystems:

> a. Chiller Process #1: including the removal of ammonia, decommissioning the equipment and moving Chillers #11 & #13 to Process #4.  Process #1 will therefore not require any new controls.

> b. Chiller Process #2: including Compressor #2 and the relocation of the King Valve.

> c. Chiller Process #3: including Compressors #3, #4, #5 & #6

> d. Chiller Process #4: including Compressors #7 & #8 and the addition of Chillers #11 & #13.

3.      OPTO 22 I/O hardware and software will be used to control the ammonia refrigeration system.  The computer control system shall have multiple pages on the monitor allowing the operator to look at the general picture of the facility or focus in on individual zones.  Each zone will also have time vs. temperature graphs to show a variation in temperatures.  Each

graph can be expanded from 5 minutes to 14 days providing a history for daily monitoring and troubleshooting.  Temperatures shall be monitored and the evaporator pressure regulators adjusted to maintain set points.  High and low temperature alarms shall be incorporated into the control schematic allowing dial-out capabilities. This system shall be set up to store temperature information for 15 months for data archiving.

4.    The suction and discharge pressures and their corresponding evaporation and condensing temperatures shall be monitored.  Compressors and condensers will then be staged and controlled to reduce cycling and improve overall efficiency of the refrigeration system by not only floating the discharge pressure, but also by floating the suction pressure. Outdoor temperature and humidity sensors will be used to monitor ambient conditions providing the information on relative humidity and wet bulb temperature.  This information will be used for controlling the condensing temperature.  Compressor runtime hours will also be logged in the computer which allows for predictive maintenance to be set up for predictive maintenance scheduling and implementation.

5.    Equipment Schedule.  New control panels at each chiller process and new control wire and conduit to all of the associated components shall be installed.  Existing control panels, wiring, and conduit will also be removed as necessary as a part of the project.  All of the new panels shall be connected via Ethernet, allowing the operator to view the system remotely and receive alerts and alarms via email and/or text messages.

6.    Control Panel Enclosures:  There will be a total of four computer control panels, one for each process and one central computer in the main office.  The panels will be located in the vicinity of each process.  The central computer that ties them all together will be located at a remote location that can be accessed for control of the systems remotely in the event of a release. With internet connection, each of the systems will also be able to be remotely observed and controlled from any smart device that has been set up to log into the control system.  These panels will include refrigeration controls for, among other things required by the Consent Decree, the compressors, condensers, and chillers in each process.  The control panels for each process will come equipped with the following:

Consent Decree – Appendix A
Case No. 1:15-cv-01900-AWI-SKO

2

a.  <u>Touch-Screen Computer</u>. These units will be standard PC computers mounted in the control panel and will come equipped with the following: 12" Color Touch-Screen; Microsoft Windows® 7; Two Ethernet ports for communication with the OPTO 22 control network.

b.  <u>OPTO22 Software Package</u>. This package will be remote accessible and user-friendly allowing operators to view and change system set points and calibrate temperatures and pressures. Gibson will be provided with a copy of the program, custom designed by its chosen contractor.

c.  <u>Custom Switch and Light Control Panel</u> equipped with the following: Floor-mounted electrical panel with automotive safety glass in door; Honeywell UDC temperature controllers, used for safety and backup control, and mounted on internal swing door; Opto 22 Digital and Analog I/O modules; Opto 22 Brain boards and module racks; Switches and Lights mounted with UDC's; Control relays, terminals, etc.

d.  <u>UPS Backup Power Supply</u> to protect the computers against power spikes.

7.  <u>Ammonia Detection and Alarm Systems</u>.  Each chiller process shall have its own ammonia sensor and alarm system with local horn and strobe alerts.  The sensors will be tied into the main refrigeration control system that will allow for automatic shutdown of equipment and alarms to be sent out via email and/or text messages.  The following detection package shall be provided for each chiller process:

a.  <u>Drager PointGuard 2100</u> – The Pointguard 2100 is a microprocessor-controlled, standalone gas detector for continuous monitoring of ammonia gasses at lower levels (i.e., 0 to 500ppm).  Gas concentration is shown on a large LED display.  A horn and two strobes provide alarm annunciation. Redundant internal relays will be used for remote alarming.

8.  The controls system will be set up with several alarm levels for which the activation levels of each are modifiable.  At a minimum, the initial warning level shall be sounded at 25ppm.  At this level the leaks are able to be addressed through standard maintenance

procedures and so notifications would include plant personnel and the refrigeration maintenance contractor.  The next level of alarm initiation shall be at 300ppm which is beyond the limit of standard maintenance PPE for ammonia.  This level shall initiate the shutdown of all of the associated refrigeration equipment and notify the Sanger Fire Dept. in addition to plant personnel and the refrigeration maintenance contractor.

9.      In addition to the vapor detection systems described above which will monitor for ammonia releases, pressure transducers will also be installed on each of the relief vent lines which will automatically detect when one of the relief valves has lifted.  As all of the relief valves have been piped into diffusion tanks that mitigate any releases, in the event a relief valve lifts, the computer will notify plant personnel.

10.      Emergency Operation.  The California Mechanical Code requires that the refrigeration system have a means to be shut down via a "Break-Glass Switch."  This SOW includes installation of this safety feature as well for each refrigeration process. The following will be supplied and mounted in an appropriate location for each process:  Emergency Refrigeration Break-Glass Switch for emergency shut-down of the refrigeration equipment.  This switch will be wired to the system such that it cuts power to all of the refrigeration equipment.

11.      Relocate Process #2 King Valve. Currently the King Valve for Process #2 is located in a space that is not readily accessible behind the condenser and underneath the chiller. This valve will be relocated to the east of the condenser against the wall (see picture below) where it can be clearly marked and easily reached in the event of an emergency.



12.     Moving the Process #2 King valve will require a complete pump out of the process.  Once the valve has been moved and pressure tested, the system shall be recharged and put back online.

13.     <u>Relocate Chillers #11 & #13</u>.  Process #1 will be decommissioned and all ammonia will be removed from that area of the plant and the process.  Chillers #11 & #13 will be moved to an area near Chiller #1 (Silver Bullet) where they can be tied into Process #4.  This work shall commence by pumping out the ammonia in Process #1 and transferring the ammonia over to Process #4.  Once evacuated, Gibson will remove all of the product transfer lines that are attached to the condenser platform.  All associated electrical components will be disconnected and the ammonia piping cut loose to clear the way for removal of the equipment.

14.     In order to gain access to the chillers, the condenser and condenser platform must first be removed.  Once this is done, the chillers and the chiller platform can be accessed for removal and transport to their new location to the north of Chiller #1.  After being set, the suction, liquid, relief vent and hot-gas defrost lines will be connected to the chillers.  All of the control & isolation valves and level controls will be moved with the chillers and reused.

15.     In order to integrate Chillers #11 & #13 into Process #4 the following items will be installed:

    a.  Liquid Feed Makeup Solenoid valve group and corresponding Liquid Level Float Switch for Chiller #1.

    b.  New control panel for Chiller #11 & #13 including temperature and product flow sensors.

    c.  Run a Hot Gas Main from Process #4 across the pipe bridge. All other ammonia lines (suction, liquid & relief) are in the vicinity of the location selected for Chillers #11 & #13.

16.     <u>Miscellaneous</u>.  The requirements of this SOW will also include completion of the following: all ammonia pipe and fittings, pipe supports for ammonia piping where necessary, and insulation of all new low temperature piping for the work described in this SOW; pipe & valve identification labeling per IIAR/ANSI recommendations; conversion of all suction regulators

over to operation by a 4-20mA modulating motor; wireless communications between Processes #2 & #3 and an Ethernet Cable from Process #3 to #4; a computer for the office that will be connected to the systems and that will allow for remote monitoring and control; all field hardware necessary to complete the installation, including the following: Temperature probes, Pressure transducers, Ambient humidity sensor, and Flow sensors; and placement of existing conduit with new rigid conduit and wiring for all of the 120V refrigeration controls, including new supports for conduit as required.

## APPENDIX B - WRITTEN SOP DEFICIENCIES TO CORRECT

The following written standard operating procedures ("SOP") for Defendant's Facility are deficient in the manner noted:

1.      SOP AR-CP-EO-101, Emergencies Involving a High-Side Compressor Leak, is not consistent with industry practices applicable to the Facility because the procedure does not identify the valves, and their identifying numbers, to be addressed in the procedure.  The SOP is also not consistent with the operator's level of training for emergency response.  The SOP states that this is an "offensive action" which requires First Responder Technician training.  Technician Level training documentation consistent with 29 C.F.R. § 1910.120(q) cannot be found in the materials provided.  Therefore, the SOP should clearly state that Defendant's operators will not perform this task.

2.      SOP AR-CP-EO-102, Emergencies Involving a Low-Side Compressor Leak, is not consistent with industry practices applicable to the Facility because the procedure does not identify the valves, and their identifying numbers, to be addressed in the procedure.  The SOP is also not consistent with the operator's level of training for emergency response.  The SOP states that this is an "offensive action" which requires First Responder Technician training.  Technician Level training documentation consistent with 29 C.F.R. § 1910.120(q) cannot be found in the materials provided.  Therefore, the SOP should clearly state that Defendant's operators will not perform this task.

3.      SOP AR-CP-MI-103, Top End Maintenance on a Reciprocating Compressor, is not consistent with industry practices applicable to the Facility because the procedure does not identify the qualifications needed to perform the work on the compressor.

4.      SOP AR-CP-SU-102, Reciprocating Compressor Startup, is not consistent with industry practices applicable to the Facility because the procedure only identifies a need to keep the suction valve open. The SOP does not identify that the discharge valve shall also be closed, a deficiency that could result in an ammonia release through a relief valve.

5.      SOP AR-CP-TO-101, Compressor Pump-Out Procedure, is not consistent with industry practices applicable to the Facility because the procedure only identifies a need to keep

the suction valve closed.  The SOP does not identify that the discharge valve shall also be closed, and this could result in an ammonia release through a relief valve.  The SOP also mentions liquid injection cooling, and this is not applicable for the reciprocating compressors used at the Facility.

6.     SOP AR-CP-TO-102, Adding Compressor Oil to a Reciprocating Compressor, is not consistent with industry practices applicable to the Facility because the procedure does not state that the compressor should be shut down before adding oil to the compressor.

7.     SOP AR-EC-ESD-101, Evaporative Condenser Emergency Shutdown, is not consistent with industry practices applicable to the Facility because the procedure does not identify the valves, and their identifying numbers, to be addressed in the procedure.

8.     SOP AR-EC-SU-101, Evaporative Condenser Initial Start-Up, is not consistent with industry practices applicable to the Facility because the procedure does not identify the ammonia valves (HSD and CD), and their identifying numbers, to be addressed in the procedure.

9.     SOP AR-EC-NO-101, Evaporative Condenser Normal Operations, is not consistent with industry practices applicable to the Facility because the procedure does not identify the condenser items to be checked (i.e., fan belt tension, proper water flow, vibration) in the procedure.

10.    SOP AR-EC-SU-102, Evaporative Condenser Start-Up, is not consistent with industry practices applicable to the Facility because the procedure does not identify the ammonia valves (HSD and CD), and their identifying numbers, to be addressed in the procedure.

11.    SOP AR-EC-TO-101, Evaporative Condenser Pump-Out Procedure, is not consistent with industry practices applicable to the Facility because the procedure does not identify the ammonia valves (HSD and CD), and their identifying numbers, to be addressed in the procedure.  Also, the SOP does not specify a time to be allowed for the condenser coil to drain.

12.    SOP AR-EC-TO-103, Purging Non-Condensables from System at Condenser, is not consistent with industry practices applicable to the Facility because the procedure does not identify the ammonia valves (Purge), and their identifying numbers, to be addressed in the procedure.

13.     SOP AR-IN-MI-101, Annual Mechanical Integrity Inspection of a High Pressure Cutout Switch, is not consistent with industry practices applicable to the Facility because the procedure does not identify the ammonia valves (discharge), and their identifying numbers, to be addressed in the procedure.  Also, the SOP does not state the number of people required to perform this task.

14.     SOP AR-PRV-MI-101, Annual Mechanical Integrity Inspection of Relief Valves is not consistent with industry practices applicable to the Facility because recognized and generally accepted good engineering practices ("RAGAGEP") indicate that the inspection should take place every six months, not annually.

15.     SOP AR-PRV-TO-101, Pressure Relief Valve Installation or Replacement is not consistent with industry practices applicable to the Facility because the procedure states that the valve should be isolated but does not state how to accomplish this step.  Also, the SOP does not take into account three-way valves for isolation.  Following this SOP as presently written is extremely dangerous to the operator.

16.     SOP AR-PV-EO-101, Emergencies Involving High Pressure Receiver, is not consistent with industry practices applicable to the Facility because the procedure does not identify the valves, and their identifying numbers, to be addressed in the procedure.  Also, the SOP is not consistent with the operator's level of training for emergency response.  The SOP states that this is an "offensive action" which requires First Responder Technician training.  Technician Level training documentation consistent with 29 C.F.R. § 1910.120(q) cannot be found in the materials provided.  Therefore, the SOP should clearly state that Defendant's operators will not perform this task.

17.     SOP AR-PV-ESD-101, High Pressure Receivers Emergency Shutdown Procedures, is not consistent with industry practices applicable to the Facility because the procedure does not identify the valves, and their identifying numbers, to be addressed in the procedure.

18.     SOP AR-PV-ESD-102, Oil Separators Emergency Shutdown Procedure, is not consistent with industry practices applicable to the Facility because the procedure does not identify the valves, and their identifying numbers, to be addressed in the procedure.

19.     SOP AR-PV-ESD-103, Oil Pots Emergency Shutdown Procedure, is not consistent with industry practices applicable to the Facility because the procedure does not identify the valves, and their identifying numbers, to be addressed in the procedure.

20.     SOP AR-PV-ESD-104, Suction Accumulator Emergency Shutdown Procedures, is not consistent with industry practices applicable to the Facility since the procedure does not identify the valves, and their identifying numbers, to be addressed in the procedure.

21.     SOP AR-PV-TO-102, Draining Oil Out of an Oil Pot, is not consistent with industry practices applicable to the Facility because there are no steps in the procedure, it does not include a step to re-open the spring-loaded valve to release any residual ammonia/oil in the line, and does not include a step to remove the spring-loaded valve after oil draining is complete. This deficient SOP could lead to another serious accident at the Facility.

22.     SOP AR-SYS-ESD-101, Emergency System Shutdown, is not consistent with industry practices applicable to the Facility because the procedure does not identify the valves, and their identifying numbers, to be addressed in the procedure.

23.     SOP AR-SYS-ISU-101, Testing and Charging an Ammonia Refrigeration System, is not consistent with industry practices applicable to the Facility because the procedure does not identify the valves, and their identifying numbers, to be addressed in the procedure. Also, the SOP does not include steps to "charge" the system with ammonia.

24.     SOP SYS-MI-101, Daily Mechanical Integrity Inspection of Refrigeration System Using a Daily Checklist, is not consistent with industry practices applicable to the Facility because the procedure states that the "vessels should never be more than 85% full" while the RAGAGEP indicate that 80% is the maximum vessel level allowed.

25.     SOP AR-SYS-TO-102, Ammonia Fill Procedure, is not consistent with industry practices applicable to the Facility because the procedure does not identify the valves, and their identifying numbers, to be addressed in the procedure.  Also, the SOP also states that the Hills

Brothers' driver "is the one in charge" and will notify Defendant's supervisor when the work is completed.  This is an extremely dangerous practice since the delivery driver is not an operator trained by the Facility.  Defendant's own employee should supervise any refilling of the refrigeration system with anhydrous ammonia to avoid overfilling the system.

26.     SOP AR-SYS-TO-104, Line/Equipment Break Procedure Preparation, is not consistent with industry practices applicable to the Facility because the procedure does not identify the valves, and their identifying numbers, to be addressed in the procedure.  Also, the SOP states that operator should "know the location of the valves which should have to be closed to isolate the line/equipment in an emergency."  The SOP line break procedure should include the identification of all valves to be closed for the line break.

27.     SOP AR-SYS-TO-106, Draining Oil out of system at an Oil Drain Valve, is not consistent with industry practices applicable to the Facility because it does not include a step to re-open the spring-loaded valve to release any residual ammonia/oil in the line, and does not include a step to remove the spring-loaded valve after oil draining is complete.  This deficient SOP could lead to another serious accident at the Facility.